### KELLOGG v. STEPHENS LUMBER CO.

1. MASTER AND SERVANT—INJURY TO EMPLOYÉ—DEFECTIVE APPLIANCE.

Negligence on the part of a mill owner in causing the death of an employé, who was killed by being thrown onto a saw, which it was his duty to keep clear of slabs and other obstructions, cannot be predicated upon the fact that a wire screen, through which the sawyer, while operating the saw, kept watch of the saw clearer, became at times so clogged with sawdust as to obstruct his view, where there is nothing to show that it was so clogged on the occasion of the accident.

2. SAME—ASSUMPTION OF RISK.

A saw clearer who continues at work with knowledge that a screen separating him from the sawyer is frequently clogged with sawdust assumes the risk of injury arising from the inability of the sawyer to see him through such screen.

3. SAME—SELECTION OF EMPLOYÉS—DUE CARE.

A mill owner is not chargeable with want of due care in the selection of a head sawyer because he fills the position by promotion from the next lower grade, instead of choosing a person of experience in the particular place.

4. SAME—CARELESSNESS OF EMPLOYÉ—DUTY TO DISMISS.

A mill owner is not to be charged with negligence in failing to discharge a head sawyer upon proof merely that he occasionally conversed in a light vein with fellow employés, thereby indicating that his attention was not centered upon his work.

Error to Otsego; Sharpe, J. Submitted October 9, 1900. Decided November 13, 1900.

Case by Julia Kellogg, administratrix of the estate of Frank Kellogg, deceased, against the Stephens Lumber Company, for negligently causing the death of plaintiff's intestate. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Affirmed.

*Arthur M. Johnson* and *Smurthwaite & Fowler*, for appellant.

*W. L. Townsend* (*Humphrey & Grant*, of counsel), for appellee.

HOOKER, J. The defendant owned and operated a sawmill, in which plaintiff's intestate worked in the capacity of a laborer, and, at the time of the accident which caused his death, his business was "clearing the saw;" *i. e.*, taking away the slabs and lumber which fell from the saw, and putting them upon rollers in motion, which removed them. To do this he stood in a space about 2½ or 3 feet long, between the saw table and the "live rollers." The

saw that was being operated was a circular saw. It ran in a table 30 inches above the floor, upon which the saw clearer was expected to stand, and the live rollers were of the same height. The sawyer stood forward of, and to one side of, the saw, where the levers by which he controlled the machinery were situated. He faced the saw. A board screen was erected between him and the saw, to protect him from the flying sawdust and splinters made by the saw; and about the middle of this screen, about 4½ feet above the table, there was a hole 10 or 12 inches square, covered by a wire screen, with meshes about 3–16 of an inch. This hole was for the sawyer to look through. The log carriage came from behind the sawyer, towards the saw, and necessarily ran the length of the log beyond the saw. The clearer stood on the opposite side of the saw, and back of it, as stated. On the occasion of the accident, a slab had been cut from a crooked log. It broke about the center; and it is the plaintiff's theory that, after the slab was cut off, the sawyer ran the carriage back, and started it forward again into the log about 6 feet, when he was shouted at or signaled to stop the carriage by another employé, and he stopped it, but immediately started it backward again. Kellogg was striving to get the slab upon the live rollers, when the head-block upon the carriage struck the end of the slab and threw him upon the saw, which cut his legs, and he bled to death. It was claimed upon the part of the plaintiff that the defendant did not furnish a safe place for the intestate to work, and that it set him at work with an incompetent fellow-servant; i. e., the sawyer. A claim was made that the defendant did not supply adequate help to clear the saw, but that appears to have been abandoned. The circuit judge directed a verdict for the defendant, and the plaintiff has appealed.

It was plaintiff's claim that the wire netting was not a proper appliance to be used in connection with the partition or screen. It is evident from the testimony that, in mills of this kind, partitions for the protection of the

sawyer are essential, and are in common use; and, while one witness said that a mill could be run without a screen over the hole, it is apparent that an open hole would subject the sawyer to the danger of sawdust in his eyes. Indeed, the claim of the plaintiff rests upon the proposition that this screen was an unfit appliance because it would get clogged with sawdust and obscure the vision of one attempting to look through it, thus showing the necessity of some obstruction to the sawdust, and no claim seems to have been made that the sawyer could not see through a screen not covered with sawdust. It is admitted that glass would be worse than the wire, and, in our opinion, the testimony conclusively shows that the wire screen was a reasonably safe and proper part of a necessary partition. It was shown that, when obscured by sawdust, it was easily cleared by a tap of the hand or a stick. Even were we to say that it would have been competent for the jury to find that this wire screen, if covered with sawdust, rendered the premises unsafe, it would be necessary for them to find that the accident resulted from that cause. Our attention is not called to any testimony tending to show that it was obscured on this occasion, and, on the contrary, there is the uncontradicted testimony of the sawyer that there was no difficulty about seeing the saw clearer, that he kept the screen clean by the use of a broom and a stick kept for the purpose, and that he saw him but a minute before he was hurt. Again, the inability of the sawyer to see through the screen, by reason of the tendency of sawdust to obstruct the vision, was as apparent to the deceased as any one. He had worked in the capacity of clearer for some time, and should have been aware of its dangers, and the necessity that the sawyer be in a position to see him while at work, if it was necessary.

It is urged that the defendant was negligent in keeping an incompetent servant in its employ, and it is maintained that the sawyer was a careless, though otherwise competent, man. The circuit judge thought that the evidence

showed that he was competent when he was employed, and that, if he was careless later, there was nothing to show that the fact was brought to the defendant's attention. The testimony showed that Grant Bettesworth, the sawyer, had worked in the mill for 12 years; that he commenced at the bottom, and worked up to the position of head sawyer. It goes without saying that, as he took each step upward, he was not an old and experienced man in his new position; and counsel argue that it was negligent to employ such a man. We think this is not so. If his experience about the mill had familiarized him with his new duties, his employer might justly consider him competent. If this were not so, and such men are to be held incompetent, there would soon be no competent men to employ, and no opportunity for laborers to advance to higher callings than that of common laborer. The burden was upon the plaintiff to show that the defendant did not use due care in the selection of a competent and ordinarily careful sawyer, and in this she has utterly failed.

But it is said that the testimony affirmatively shows that Bettesworth was careless, and that the evidence justifies the inference that the employer knew it. There is some testimony that tends to show that slabs accumulated on one or more occasions beyond the power or disposition of the clearer to take care of. One testifies that on one or more occasions he got out of the way to avoid accident. We are asked to conclude that this was carelessness upon the part of the sawyer, and to infer that he should stop the mill until the space was entirely clear. Richard Chubb was one of these witnesses who saw the mill blocked with slabs three or four times, and he says that the foreman of the mill saw it so. He also stated that the sawyer looked around at the tally board when the saw was in the log on one or more occasions. In the absence of proof, we cannot say that ordinary prudence in a sawyer forbids a glance at the tally board when the saw is in the log; and the witness on cross-examination stated that:

"Mr. Bettesworth operates his saw as ordinary sawyers operate a saw, and ran this mill as circular saw mills are ordinarily run,—just about the same as ordinary, careful, and prudent circular sawyers run a saw. He ran it about the same as other circular sawyers in mills where I have worked."

And his affidavit was produced, in which he stated that he had worked one season with him, and considered him a competent and careful sawyer.

Joseph Bloom testified that he worked in the mill, and had seen it blocked quite a few times, and on such occasions,—

"Of course, Mr. Bliss [the foreman] jumped over and gave us a hand, in order to keep the rollers clear, and threw them onto the floor; and on such occasions Mr. Kellogg, the deceased [who was clearing the saw], had to do the best he could with the slabs that were coming through the saw."

From this testimony it would appear that it was the ordinary way to keep the saw going, and, if Kellogg allowed slabs and other stuff to accumulate, there was other help at command to relieve the jam. Nobody testifies that this was an unusual way to run a mill, and, if there had been such testimony, the plaintiff's intestate was necessarily fully aware of the method, and assumed the risk. But, furthermore, there was no glut of slabs on this occasion; there was barely one piece of a slab there; and, when the saw was gigging back, the deceased, from some cause, failed to get or keep it out of the way of the carriage, and the sawyer did not prevent the result.

Another witness testified that, one-half of the time he was there, the head and tail sawyers were talking about hunting ducks, and aiming sticks as though shooting ducks. In *Baltimore Elevator Co.* v. *Neal*, 65 Md. 438 (5 Atl. 338), it is said:

"Negligence, such as unfits a person for service, or such as renders it negligent in a master to retain him in his employ, must be habitual, rather than occasional, or of such a character as renders it imprudent to retain him in

service.   A single exceptional act of negligence will not prove a servant to be incapable or negligent."

We think the evidence falls short of showing that the sawyer was an incompetent.   No man is infallible.   The majority of men have to obtain their livelihood by some kind of employment; and the law does not condemn them as incompetent, and practically blacklist them, by denying to the  employer the right to hire them, without some well-founded reason for saying that they are unfitted, by reason of ignorance, physical or mental infirmity, or habit, to perform the ordinary duties of their callings.   There is a practical side to such questions, that the law does not overlook; and it does not sanction the doctrine that, before a man can be safely employed, he must have attained the highest standard of skill, and never failed to do exactly the best thing under the circumstances.

The learned circuit judge could do nothing else than to hold that the plaintiff had failed to prove that the loss of her husband was due to the defendant's negligence, and his judgment is affirmed.

The other Justices concurred.