JACKSON *v.* SCHILLINGER BROS. CO.

1. MASTER AND SERVANT — NEGLIGENCE — INCOMPETENCY—FELLOW-SERVANTS—NOTICE.

Evidence that plaintiff's fellow-servant behaved like a boy, smoked cigarettes, was inattentive to his work and engaged in joking and talking, did not establish incompetency to do unskilled labor; and the employer was not required by law to give instructions or inquire into the experience or competency of men to do that kind of work.[1]

2. SAME—EVIDENCE OF NOTICE—ACTUAL NOTICE.

Nor did a warning by one of the workmen to defendant's foreman that there would be an accident if he retained the inattentive employee, not stating his reasons or specifying why he considered the laborer incompetent, put the employer upon notice of the alleged incompetency.

3. SAME—RISKS ASSUMED.

And where plaintiff had worked for upwards of two days within ten feet of the fellow-servant, without observing anything to indicate incompetency, he must be held to have had equal knowledge of the facts with the employer, and was chargeable with the assumption of the risk of the negligence of his coemployee.

---

[1] For the master's duty as to selection, employment and retention of fellow-servants, generally, see note in 48 L. R. A. 369. And upon the liability of a master for injuries caused by incompetency of a fellow-servant, see note in 25 L. R. A. 710.

Error to Menominee; Flannigan, J. Submitted June 5, 1914. (Docket No. 26.) Decided October 2, 1914.

Case by George Jackson against Schillinger Bros. Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed.

*Fred H. Haggerson* and *McCaskill & McCaskill,* for appellant.

*Michael J. Doyle,* for appellee.

The defendant is an erecting company, and in August, 1911, was engaged in erecting a building for a brewery in the city of Menominee, Mich. The floors and ceiling of this building are concrete, and in doing the work it became necessary to put up certain forms under the ceiling, into which the concrete was poured, and which remained there until the concrete became set, after which the forms were removed and again used for the same purpose on the next floor above. The forms were in sections, each section being about 12 feet long, made of boards, and weighing about 70 pounds. The method employed for taking the forms down was to erect a scaffold about 14 feet from the floor, which left a space between the floor of the scaffold and the ceiling of about 5 feet. The scaffold consisted of three horses upon which were laid two planks 14 inches wide. It was the duty of the workmen to mount the scaffold, cut the wires which held the planks supporting the forms, and then take down the forms section by section. After the wires were cut and the plank removed the forms would still remain in place, sticking to the concrete. The men would then take cold chisels and hammers and pry the edges of the forms loose from the concrete, after which it could be removed. The plaintiff, a competent carpenter of some years' experience, was instructed to take down

these forms.   After working at this for a short time
with another carpenter by  the name of  Muchinsky,
Muchinsky was sent to the floor above to re-erect the
forms as they were taken down, and two boys or young
men were placed upon the platform to assist plaintiff
in the work.   Plaintiff continued with this help to
remove the forms for 2½ days or more, when the ac-
cident happened upon which he bases his suit.   He
testified that, having removed the wires and planks
from a given form and while in the act of stooping
over to pick up his hammer and chisel from the plat-
form, he heard one of the boys, Fred Weimer by
name (the other boy having shortly before that time
left the platform) strike the form a blow, upon which,
as he straightened up, the form fell, striking him in
the breast, knocking him to the floor and causing
him to sustain certain injuries for which he seeks com-
pensation.

The sole grounds of negligence relied upon by plain-
tiff are that defendant employed an incompetent work-
man in the person of Weimer, that defendant knew,
or should have known, of such incompetency, and that
defendant retained Weimer in its service after said
notice which is alleged to have been received by de-
fendant before the injury.   Upon the question of
Weimer's incompetency and notice to the defendant,
the following testimony was given by the witness
Muchinsky, who, as before stated, preceded Weimer
upon the scaffold in assisting plaintiff to remove the
forms, and when Weimer and the other boy took his
place, he proceeded to erect forms upon the floor above.
It was apparent, however, that he was back and forth
from time to time in the room where the forms were
being removed.

"The first time my attention was attracted to him
was on the concrete.  He was wheeling concrete.  When
I saw him doing his work wheeling, he was smoking

cigarettes off and on, and rolling cigarettes, and when I went by him he was talking to me and giggling and laughing also. When I first saw him he was working more in a fooling way instead of a man that ought to pay attention to the work. He done more as a boy would. He was making cigarettes, and he would smoke the cigarettes, that is, on the concrete. He would take a little time and stop from working and make the cigarettes. I have seen him a few times a day, I do not know how many or how often he did it. I saw him wheeling concrete with a wheelbarrow. When he had a load on, of course, he was wheeling the same as anybody else would, and when he hadn't a load on he was, it seems, more in a jollying way. He did not run with it straight as a man would. Maybe that was his way of doing it. I noticed his actions while he was hauling concrete with regard to the other men. They were fooling together. I had occasion to pass them frequently. I remember once he asked me if I didn't want a bottle of beer. It is a quite a while ago, and I don't remember everything. That was during his work. That occurred only once I remember of. I know when they used to bring the case in he would go himself and get one or two extra bottles and hide them. I saw him at work on the scaffold. He conducted himself more like fooling as much as I seen than he was at work. I remember that he had a cold chisel in one hand and a hammer in the other, and he was holding the cold chisel up and going to knock the form down on them. I seen him smoking cigarettes on the scaffold every day.

"Q. Was his smoking cigarettes habitual or occasional?

"A. Well, occasionally I would see him smoking. I don't know what he was doing all the time, as many times as he went down, and he went down six or seven times and sometimes more. Pretty nearly every time he went down he had a cigarette. He was doing that on the scaffold. I had occasion to pass down the ladder where he was working on the scaffold. He acted like he was fooling away just the same as if you asked me a question, and I didn't pay any attention; he would be talking to somebody else and the same at his work. I told the foreman about it. I told the fore-

man that he should give Jackson another man in the place of those two boys, and that if he didn't somebody is going to get hurt. The foreman didn't say anything to me. That was the first time I spoke to him. I spoke to him after that. The second time I told him the same thing, and he didn't answer me, and I spoke to him the third time. I told him that he had better get a man to help Jackson take down those forms and take those two boys away because they were no good to Jackson, and I said that somebody is going to get hurt here. He says, 'What shall I do with them?' I says, 'Fire them.' He said, 'What shall I do with them? I have not got any other work for them.' I says, 'Fire them.' That was all, and it ended there. The things that I saw the boy do before I made that statement to the foreman was, I seen that he didn't pay any attention to his work, and I seen that quite a few times because I was up and down the ladder pretty often. I saw this boy working on the scaffold, and I seen him working on the concrete. On the scaffold I seen him and he laughed and giggled, and when I came down the ladder he asked me if it was not time for the beer to come around. I noticed him doing those things quite a few times during the day, and while he was working on the concrete it was about the same thing. I didn't keep track of it, but I seen him quite a few times off and on. I knew about the chalk incident. He was giggling and fooling on the scaffold, and this other man was giving chalk to mark those forms to number them all so that these forms could be placed back together the same as they were taken down, and this long fellow numbered every piece when they were together, so that when they were taken down they could be placed together, and this short fellow took the chalk away from him by fooling, and started to mark the forms, and refused to work, and they were fooling with the forms and marking them around, and this long fellow went down off the scaffold, and it was right then when Jackson got hurt."

Cross-examination by Mr. McCaskill:

"I was doing carpenter work for Schillinger Bros. Company. I was not foreman, but the foreman sent me all over the work. I don't know the name of the

foreman. This is the foreman that I told that he had better give a man up there to help Jackson. I don't know his name. When I told him he was down on the basement floor. At the time that I told him he was at that time doing carpenter work. I don't remember just where. I was making forms there, and if there was any form that broke or the wheelbarrow cut through, I had to go and fix that, or if the elevator gave out, I was supposed to go and fix that. I didn't do any carpenter work down in the room where they were taking down the forms. We used to go down and get the forms and then go down and carry them up on the second floor. We were taking those forms that had been taken down, and was carrying them up to the second floor. The other carpenters helped me. The only one I knew was George, that is the only name I know. George Jackson and one fellow by the name of Antone, and I don't know any other name. Jackson didn't help me carry forms out of this room. It was a fellow by the name of Antone. Sometimes five of us carried out the forms. I noticed this boy before I carried out the forms. I noticed him the day before we ever started to carry the forms up, and I saw him once in a while smoking cigarettes and laughing. I didn't see anybody else smoking cigarettes at that time. I don't remember seeing anybody else smoking cigarettes there. * * * We were working there in the brewery and we got the beer there and drank it. I didn't think anything strange about that. I didn't consider him negligent or careless because he drank beer, but he didn't pay any attention to what he was doing. I considered him negligent and careless because he would roll up a cigarette and smoke it while at work. * * * There was not anything particular in the size of those boys that made me think it was dangerous to have them up there. If they had paid attention to their work they might have done it all right. I didn't tell him [the foreman] they were not paying attention to their work. I told him they were not fit to work up there with Jackson. I simply told him that he had better put a man up there with Jackson and take those boys away. That is all I told him. I didn't tell him what they were doing. I didn't think it was my business to explain to him about his

men. I don't know whether he knew what they were doing or not. If he had seen them working I suppose he could see himself what they were doing. I didn't tell him."

Upon the question of Weimer's competency, plaintiff himself gave testimony, upon cross-examination as follows:

"These two young fellows helped me on the scaffold to take down these forms for pretty nearly three days. They were all the time after Frank left. During the three days that I was working there with these two men one of these fellows was scared. He was the tall fellow. I don't know who he is. He was quite a tall, young lad. He was not the man that was with me at the time I got hurt; he was on the ground.

"*Q.* Now, the man that was with you on the scaffold at the time this accident occurred, had you seen anything out of the way with him prior to the time you got hurt?

"*A.* No, sir; I did not.

"*Q.* He was working just the same as anybody else, was he?

"*A.* I didn't pay any attention to him.

"*Q.* You were working right there with him?

"*A.* He was on one end of the form, and I was on the other end.

"*Q.* As far as you could see, he was doing his work just the same as anybody else would?

"*A.* Well, yes.

"*Q.* And you do not think he was careless or indifferent about his work, do you?

"*A.* No."

The foregoing constitutes all of the material testimony on the question at issue tendered on behalf of the plaintiff. The defendant through the witness Weimer denied the fact that plaintiff's injury occurred in the manner testified to by him, and said that plaintiff simply stepped to one side, lost his balance, and fell. The court upon this point charged the jury as follows:

"The plaintiff claims he was injured by the negligence of Weimer; he concedes that Weimer was a fellow-servant, and that he cannot recover from the defendant unless it appears that Weimer was an habitually careless person, and that his carelessness was of such a character as made it imprudent to keep him in the service, and that the defendant either knew, or in the exercise of due care should have known, that Weimer was that sort of a servant. Now, gentlemen, we are, as I have already said, at the main question in this case. If you pass these other questions in favor of the plaintiff, then, in order to find the defendant liable, you must be satisfied by a preponderance of the evidence that Weimer was an habitually careless servant, and that the defendant, or the foreman of the defendant, because he represented the defendant at the time and place in this connection, that the foreman either knew, or in the exercise of care and prudence should have known, of the careless character of the servant. In considering these questions, you will understand this to be the law: That you cannot find the defendant guilty of negligence in retaining the servant Weimer in its employ in this work unless you find by a preponderance of the evidence that he was habitually careless in the performance of the work itself. To make myself clear, gentlemen, if you find that Weimer smoked cigarettes and took a glass of beer and hollered at men when they were going up and down, always boyish and buoyant as boys are at times, when he was not engaged in the work itself, then he was not a careless servant; but you must find that while he was engaged in taking down the forms, while he was doing his work, that he was habitually careless, and that the defendant knew that, or if the defendant or its foreman had exercised reasonable care and diligence to ascertain this fact, he would have known it. Again, in order to charge the defendant with negligence in retaining Weimer in its employ in this work, it is not enough to show, and it will not be enough for the jury to find, that he was guilty of a single act or an exceptional act of carelessness or negligence. It must appear that the carelessness of the servant was habitual rather than occasional."

A verdict having been rendered in favor of plaintiff and judgment entered thereon, the defendant brings the case to this court for review.

BROOKE, J. (*after stating the facts*). The work to be performed by plaintiff and his helpers, including Weimer, was simple in character. It involved no particular hazard and required no particular skill. It was plaintiff's duty to saw the forms himself, after which he and his helpers loosened and lowered them. Any one of reasonable intelligence and sufficient strength would be competent to perform such labor. And it is not contended that Weimer was lacking in either particular. Under such circumstances and for the performance of such labor the employer is not required by law to either give instructions in regard to the work or inquire into the experience of the laborer. *Timm* v. *Railroad Co.*, 98 Mich. 226 (57 N. W. 116). In *Kellogg* v. *Lumber Co.*, 125 Mich. 222 (84 N. W. 136), it is said (quoting from *Baltimore Elevator Co.* v. *Neal*, 65 Md. 438 [5 Atl. 338]) :

"Negligence, such as unfits a person for service, or such as renders it negligent in a master to retain him in his employ, must be habitual, rather than occasional, or of such a character as renders it imprudent to retain him in service. A single exceptional act of negligence will not prove a servant to be incapable or negligent."

The only evidence of Weimer's incompetency is furnished by the witness Muchinsky. When analyzed it amounts simply to this: That on various occasions witness saw Weimer smoking cigarettes on the scaffold within 10 or 12 feet of plaintiff, that he saw him laughing and giggling, and that he joked him about a bottle of beer, all of which took place in the presence of plaintiff. He further testifies that Weimer seemed to him to be careless and unattentive. This testimony

in our opinion falls far short of proving incompetency on the part of Weimer to perform the labor in hand. Many good workmen laugh and joke. Undoubtedly some good workmen even smoke cigarettes, but we have never before heard either act urged as a ground for claiming that a man who indulges in them is incompetent to perform hard labor. Moreover, the record fails to disclose that the defendant had any knowledge of even these acts on the part of Weimer. It is true Muchinsky testifies that he told the foreman he should take the boys from the platform and give Jackson a man to help him, otherwise there would be an accident, but he carefully refrained from assigning any reason for his request. If the foreman received the communication from Muchinsky exactly as testified to by Muchinsky (and he denies having received it), he would have been perfectly justified in disregarding it, in the absence of any statement of specific instances of misconduct or incompetency calling for the warning. *Snodgrass* v. *Steel Co.*, 173 Pa. 228 (33 Atl. 1104).

But the remarkable and controlling consideration is that the plaintiff himself worked within 10 feet of Weimer for upwards of 2½ days, and he must have seen every act and heard every word uttered by Weimer during that time. The conduct of Weimer evidently did not impress plaintiff as either careless or as evidence of incompetency. On the contrary, assuming Muchinsky's statements to be true, that conduct did not afford any evidence to plaintiff that Weimer was either careless or incompetent. Where employer and employee have equal knowledge of the incompetency of a fellow-servant of the employee who is retained in service, each party takes the risk, unless the employer undertakes to give special directions. *Davis* v. *Railroad Co.*, 20 Mich. 105 (4 Am. Rep. 364).

We must hold that there was no evidence introduced by the plaintiff warranting the submission of the question of defendant's negligence to the jury.

The judgment is reversed, and a new trial ordered.

MCALVAY, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.

